**PUGET SOUND POWER & LIGHT CO. v. FEDERAL POWER COMMISSION.**

No. 8401.

United States Court of Appeals for the District of Columbia.

Argued June 4, 1943.
Decided Aug. 23, 1943.

Mr. William E. Tucker, of New York City, with whom Mr. Paul D. Miller, of New York City, appeared on the brief, for petitioner.

Mr. Charles V. Shannon, General Counsel, Federal Power Commission, of Washington, D. C., with whom Mr. Louis W. McKernan and Mr. Reuben Goldberg, both of Washington, D. C., appeared on the brief, for respondent.

Before GRONER, Chief Justice, and EDGERTON and ARNOLD, Associate Justices.

ARNOLD, Associate Justice.

The petitioner in this case holds a license from the Federal Power Commission on a project known as the Rock Island Project No. 943 for a hydro-electric plant on the Columbia River in the State of Washington. Acting under the authority of Section 797(b),[1] the Federal Power Commission determined the actual legitimate original cost of the project and required petitioner to correct its books of account to reflect such determination.

The petitioner seeks a review of that order on the ground (1) that the Commission refused to allow interest and taxes up to the date of the termination of the construction; and (2) that it refused to allow, as costs of the project, allocations of overhead costs of two engineering companies which were affiliated with the petitioner.

■ With respect to the first ground for review, to wit, the refusal to allow petitioner to capitalize interest charges up to the date of actual completion of the project, the situation is as follows: Under Section 3, sub-division 13, of the Federal Power Act, net investment in a licensed power project is defined as the "actual legitimate original cost thereof as defined and interpreted in the 'classification of investment in road and equipment of steam roads, issue of 1914, Interstate Commerce Commission'." This classification allows interest during construction to be added to cost. The principle of allowing the capitalization of this interest charge rests on the premise that during the period of construction "there is no operating income available with which to meet these necessary charges incident to construction.[2] To justify allowance of interest during construction as part of the cost of the project it must appear that the licensee carried out his obligation, which is a term of the license, to prosecute the construction with due diligence.

The license for the project in the present case was issued on January 21, 1930 to the Washington Electric Company, and thereafter transferred to petitioner, with the Commission's approval, on June 30, 1931. The actual completion of the project was January 21, 1933. The Commission, however, found that, in the exercise of due diligence required by the Act and the license, the project should have been completed by August 1, 1932. The Commission, therefore, took that date rather than January 21, 1933, as the termination of the period during which the interest and the taxes could be allowed as part of the original cost. Petitioner admits that so far as physical conditions were concerned, the project could have been completed earlier than January, 1933. The delay in construction during 1930 and 1931 was caused by the petitioner in order to avoid the hazard of borrowing large sums during the depression.

Petitioner claims, on the basis of opinion evidence, that the unsettled financial conditions of the years 1930 and 1931 made it inadvisable to sell bonds on a long term basis because of the uncertainty of future interest rates. The same conditions made it hazardous to borrow on short term notes. Furthermore, the demand for power had dropped so that there was a probability of loss if the project were put into operation as soon as physical conditions permitted. Petitioner then argues that since sound business judgment during the financial upset of 1930 and 1931 required it to delay completion of the project, such delay was consistent with due diligence. Indeed, it claims credit for "high courage" in completing the project at all.

There is nothing in the Act or in the license which justifies such an interpretation of the obligation of the licensee to prosecute the construction of a Federal power project with due diligence. To permit interest to be added to costs where the sound business judgment of the licensee counsels delay in order to improve its financial position is to allow an element of pure speculation to be included in net value. If such an element of cost were allowed it would give an incentive to the licensee to delay the construction of any project where it felt it would lose money by bringing it into immediate operation.

■■ When a license is accepted the licensee assumes the risk of loss in the hope of profit. If losses are incurred in the first few years they are not an element in determining the net value.[3] By the same token if delays are deliberately caused during construction to avoid financial risk in borrowing money for an earlier completion

---

[1] Section 4(b) of the Federal Water Power Act, as amended, 16 U.S.C.A. § 791a et seq.

[2] Chelan Electric Co., Licensee, 1933, 1 F.P.C. 91, 97.

[3] Galveston Electric Co. v. City of Galveston, 1922, 258 U.S. 388, 42 S.Ct. 351, 66 L.Ed. 678.

of the project, interest during such period should not be considered as part of the legitimate cost of the project.

The petitioner does not contest this principle in the ordinary case. It claims, however, that the depression which began in 1930 and 1931 should be compared to a flood or an earthquake as a justification for delay, and should, therefore, excuse the petitioner from obligations which were entered into with the expectation of normal times. Such a doctrine has never been applied to obligations of ordinary citizens during a depression, and we can find nothing in the statute to warrant a special exception in favor of a public utility. Such a doctrine would require distinction between minor and major conditions of financial distress in order to determine which ones were bad enough to be compared with earthquakes. The economic result would be to encourage licensees under Federal licensed power projects to stop employment at the very time that employment was most needed. And it would be going far to say that this was within the Congressional intendment.

In the case of Florida Power Corporation, Licensee, 1937, 1 F. P. C. 390, upon which the petitioner relies, the Commission did extend the time during which interest on construction funds could be capitalized because the licensee was unable to get funds under depression conditions. Whether that holding was right is a serious question which we are not now called upon to decide. In that case the Commission found "that construction proceeded as rapidly as funds were made available". In the case before us petitioner had the ability to borrow and refrained for business reasons.

■ As an alternative argument for an extension of the construction period, petitioner claims that even if it had proceeded with the project certain mechanical difficulties which were discovered during the progress of construction would have developed at an earlier period, and, therefore, in all probability, delayed completion until November 15, 1932. The evidence to support this consists of the opinions of expert witnesses for the petitioner to the effect that these difficulties were met and corrected within a reasonable time after discovery. This may very well be true, but it does not follow that because of this more time should have been allowed by the Commission. The undisputed fact is that the necessary parts for this construction were purposely held back and their installation purposely delayed with the object of prolonging the completion. In these circumstances the Commission was well within its powers in refusing to consider the subsequent repairs and revisions as justifying extension of time of completion.

■■ The second group of items which the petitioner claims have been erroneously disallowed, as elements of cost, relate to fees paid to Stone & Webster Engineering Corporation and Stone & Webster Service Corporation. It is admitted that these corporations are affiliates of the petitioner and, therefore, only actual cost of the affiliated companies can be included in the net value of the project. The Commission disallowed contingent salaries paid to a small percentage of the employees of Stone & Webster. These salaries were based on a percentage of the net earnings of the corporation. For that reason the Commission found them to be a share in the profits of the affiliate, and, therefore, not allowable as an element of actual cost. It is difficult to see how the Commission could have found otherwise. The fact that these payments have been allowed as deductions from the corporate income tax of Stone & Webster has no bearing on the question before the Commission. Every element of profit of an affiliated company must be excluded in the determination of the actual legitimate cost of the project. That rule cannot be avoided by making a selected group of employees quasi partners in the enterprise and distributing the profits to them.

In the case of Alabama Power Co. v. Federal Power Commission,[4] the court compelled the Commission to allow bonuses paid to employees generally at the end of the year. But these bonuses were not contingent upon profits. They had been paid so regularly for seven or eight years that the court treated them as salaries, not as contingent payments or unexpected gifts. This decision has no bearing on the question presented here.

■ The balance of the items disallowed were listed as "investigation expenses", "other new business expenses" and "miscellaneous items". They consist of expenses of branch offices maintained to contact existing and prospective clients and develop new business for Stone & Webster, of advertising expenses and amounts paid for public-

---

[4] 5 Cir., 1943, 134 F.2d 602, 610.

ity, and finally of miscellaneous items for the general welfare of employees, their entertainment, expenses incident to sickness, payments to relatives of deceased employees, and a donation to the Massachusetts Institute of Technology which gave Stone & Webster a somewhat indefinite privilege of using the library and consulting with the staff of that institution. Nothing in the record links these expenses with the particular project sufficiently to warrant this court in reversing the ruling of the Federal Power Commission in disallowing the items. As the Supreme Court said in National Labor Relations Board v. Link-Belt Co.,[5] "Not by accident, but in line with a general policy, Congress has deemed it wise to entrust the finding of facts to these specialized agencies. It is essential that courts regard this division of responsibility which Congress as a matter of policy has embodied in the very statute from which the Court of Appeals derived its jurisdiction to act."

The orders of the Federal Power Commission will, therefore, be affirmed.

---

[5] 1941, 311 U.S. 584, 597, 61 S.Ct. 358, 365, 85 L.Ed. 368.